United States Court of Appeals,

Eleventh Circuit.

Nos. 94-7024, 94-7081.

Hoover WHITE, for himself and on behalf of all other persons similarly situated;  John A. Dillard, for himself and on behalf of all other persons similarly situated;  Glenn Moody, for himself and on behalf of all other persons similarly situated, Plaintiffs-Appellees,

Ralph E. Bradford, Sr., Intervenor-Plaintiff-Appellant,

Christopher Boehm;  John Curry;  Jack Williams;  Mark G. Montiel, Intervenors-Plaintiffs,

v.

The STATE OF ALABAMA;  James Bennett, in his official capacity as Secretary of State for the State of Alabama, Defendants-Appellees.

Hoover WHITE, for himself and on behalf of all other persons similarly situated;  John A. Dillard, for himself and on behalf of all other persons similarly situated;  Glenn Moody, for himself and on behalf of all other persons similarly situated, Plaintiffs-Appellees,

Ralph E. Bradford, Sr., Christopher Boehm, Intervenors-Plaintiffs,

Johnny Curry;  Jack Williams;  Mark G. Montiel, Intervenors-Plaintiffs-Appellants,

v.

The STATE OF ALABAMA, James Bennett, in his official capacity as Secretary of State for the State of Alabama, Defendants-Appellees.

Jan. 24, 1996.

Appeals from the United States District Court for the Middle District of Alabama.  (No. CV-94-T-094-N), Myron H. Thompson, District Judge.

Before TJOFLAT, Chief Judge, BLACK, Circuit Judge, and GOODWIN[*], Senior Circuit Judge.

TJOFLAT, Chief Judge:

---

[*]Honorable Alfred T. Goodwin, Senior U.S. Circuit Judge for the Ninth Circuit, sitting by designation.

The members of Alabama's appellate courts—the Supreme Court, the Court of Criminal Appeals, and the Court of Civil Appeals[1]—are elected to office in at-large partisan elections.[2] In this case, Hoover White, a black voter and representative of a class of all black voters in Alabama,[3] contends that this at-large election scheme dilutes the voting strength of black voters in Alabama in violation of section 2 of the Voting Rights Act because it affords black voters, on account of their race, "less opportunity [than white voters] ... to participate in the political process and to elect representatives of their choice." Voting Rights Act of 1965, Pub.L. No. 89-110, § 2(b), 79 Stat. 437, 42 U.S.C. § 1973(b) (1988). White also contends that the challenged at-large election scheme denies Alabama's black voters the equal protection of the laws guaranteed them by the Fourteenth Amendment. He seeks injunctive relief sufficient to remedy these deficiencies in the method of electing Alabama's appellate judges. Finally, White

---

[1]The judicial power of Alabama is vested exclusively in a "unified judicial system" consisting of, at the appellate level, a Supreme Court, a Court of Criminal Appeals, and a Court of Civil Appeals. Ala. Const. amend. 328, § 6.01(a). The Supreme Court consists of "one chief justice and such number of associate justices as may be prescribed by law." Id. § 6.02(a). The courts of appeals consist of "such number of judges as may be provided by law." Id. §§ 6.03(a), (b).

[2]The Alabama Constitution provides that the justices of the Supreme Court and the judges of the courts of appeals are "elected by vote of the electors within the territorial jurisdiction of their respective courts." Ala. Const. amend. 328, § 6.13 (1973). Such elections are part of Alabama's partisan general election scheme for state office holders. See generally Ala.Code tit. 17 (1995).

[3]Joining White as plaintiffs and class representatives are John Dillard and Glenn Moody, both of whom are black voters. We refer to these plaintiffs collectively as "White."

claims that the legislature's alteration of the structure and composition of Alabama's appellate courts, in 1969 and on two subsequent occasions, has not been precleared under section 5 of the Voting Rights Act. He seeks an order declaring the legislature's actions inoperative. *See* 42 U.S.C. § 1973c (1988).[4]

Shortly after White commenced this action, his attorneys and the Attorney General of Alabama entered into settlement negotiations; these negotiations led to an agreement which the

---

[4]Section 5 of the Voting Rights Act requires certain states, including Alabama, to obtain either judicial preclearance from the United States District Court for the District of Columbia or administrative preclearance from the Attorney General of the United States before altering "any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting...." 42 U.S.C. § 1973c. Section 5 applies to judicial elections, *Clark v. Roemer,* 500 U.S. 646, 111 S.Ct. 2096, 114 L.Ed.2d 691 (1991), and thus may apply to the legislative enactments involved in this case.

If "voting changes subject to § 5 have not been precleared, § 5 plaintiffs[, such as White in this case,] are entitled to an injunction prohibiting the State from implementing the changes." *Id.* at 652-53, 111 S.Ct. at 2101. Such relief may not be granted by a United States district judge; rather, it must be granted by a three-judge court convened by the chief judge of the judicial circuit in which the case is filed and consisting of one United States circuit judge and two United States district judges (one of whom is usually the judge before whom the case was filed). *See* 42 U.S.C. § 1973c; 28 U.S.C. § 2284 (1994).

As indicated in part I.B., *infra,* after White filed his complaint, a three-judge court was convened to hear his § 5 claims. That court lacks jurisdiction, however, to entertain White's claims under § 2 and the Equal Protection Clause of the Fourteenth Amendment. Accordingly, those claims remain before the district court—specifically, before the judge to whom the case was assigned at the time of filing, the Honorable Myron H. Thompson.

In this appeal, we are called upon to review a final judgment entered by Judge Thompson. References herein to the district court are, therefore, to Judge Thompson and not to the three-judge court, unless otherwise indicated.

United States Department of Justice precleared. The district court, over the objection of the appellants, who had intervened in the case, approved the agreement and made it part of the final judgment now before us. *White v. State of Alabama,* 867 F.Supp. 1519 (M.D.Ala.1994). That judgment, if implemented, will restructure the Supreme Court of Alabama and the two courts of appeals by increasing the size of those courts and creating a selection process that will ensure that the black voters of Alabama have at least two "representatives of their choice" on each court.

The appellants, a black voter and a judge on the Court of Criminal Appeals, contend that in fashioning such relief the district court exceeded its authority under section 2 of the Voting Rights Act,[5] and that the court's entry of the judgment therefore constituted an abuse of discretion. We agree, and therefore vacate the district court's judgment and remand the case for further proceedings.

This opinion is organized as follows. Part I describes the history and current structure of Alabama's appellate courts and traces the history of this litigation. Part II demonstrates how the relief provided by the court's judgment is foreclosed by section 2 of the Voting Rights Act. Part III addresses a district court's power to increase the size of an elected governmental body—here, Alabama's three appellate courts—in an effort to remedy

---

[5]Appellants also contend, among other things, that the relief granted by the district court is precluded by the Equal Protection Clause of the Fourteenth Amendment because it establishes a *de facto,* if not a *de jure,* racial quota system. Because we dispose of the case on statutory grounds, we do not address the constitutional argument.

racial vote dilution. Finally, part IV addresses, and rejects, the argument advanced by White and the United States, as *amicus curiae,* that, notwithstanding the limitations discussed in parts II and III, the remedy provided by the district court's judgment is permissible because the judgment is a "consent decree."

### I.

### A.

Prior to 1969, Alabama's appellate courts consisted of a seven-justice Supreme Court and a three-judge intermediate appellate court called the Court of Appeals. The members of these courts were chosen for staggered six-year terms in at-large partisan elections. Vacancies occurring prior to the end of a term were filled by appointment by the Governor;[6] these appointees then stood for election in Alabama's next general election held after the appointee had served one year in office.

In 1969, the Alabama legislature added two seats to the Supreme Court. Act No. 602, § 1, 1969 Ala.Acts 1087 (codified at Ala.Code § 12-2-1 (1995)). The legislature also divided the Court of Appeals into the Court of Criminal Appeals and the Court of Civil Appeals, each with three judges. Act No. 987, § 1, 1969 Ala.Acts 1744. In 1971, the legislature added two judges to the Court of Criminal Appeals, Act No. 75, § 1, 1971 Ala.Acts 4283, and in 1993, it added two seats to the Court of Civil Appeals, Act No. 93-346, §§ 1, 4, 1993 Ala. Acts 536, 537. *See* Ala.Code § 12-3-1

---

[6]The Alabama Constitution provides that, "The office of a judge shall be vacant if he dies, resigns, retires, or is removed. Vacancies in any judicial office shall be filled by appointment by the governor...." Ala. Const. amend. 328, § 6.14 (1973).

(1995).  The elections for appellate judges have continued to be partisan and held at large, and the Governor has continued to fill mid-term vacancies.

B.

On January 27, 1994, Hoover White, on behalf of himself and the black voters of Alabama, brought this suit against the State of Alabama and its Secretary of State.  He alleged that the State had not obtained preclearance, as required by section 5 of the Voting Rights Act, of any of the legislative enactments described above.[7] White asked for a declaration that these enactments were void *ab initio* and for appropriate injunctive relief.  A three-judge court was promptly convened to consider White's section 5 claims.[8]  *See* 42 U.S.C. § 1973c;  28 U.S.C. § 2284.

White also alleged that the at-large system for electing the members of Alabama's appellate courts denies Alabama's black voters, on account of their race, the same opportunity as that given to white voters to participate in the election of those members.  He asked the court (1) to declare the at-large election scheme illegal under both section 2 of the Voting Rights Act and

---

[7]White's original complaint challenged only the split of the Court of Appeals and the subsequent addition, in 1971 and 1993, of two judges to each of the new courts.  On February 16, 1994, White amended his complaint to include a challenge to Act No. 602, 1969 Ala.Acts 1087, which enlarged the Supreme Court.  We refer to White's amended complaint as the "complaint."

[8]On April 15, 1994, as indicated in the text part I.D., *infra,* White's attorneys and the Alabama Attorney General advised the three-judge court that they had reached the settlement agreement described in the text and asked that court to stay further proceedings on White's § 5 claim so that the district court could consider the agreement.  The three-judge court granted their request the same day.

the Equal Protection Clause of the Fourteenth Amendment, and (2) to fashion an appropriate remedy to cure these violations.

Within days after White filed his complaint, and before the defendants were required to file their answer, White's attorneys and the Attorney General of Alabama, Jimmy Evans, agreed to settle the case.[9] As they were negotiating the terms of the settlement, Ralph Bradford, a black voter, moved the court on February 2, 1994, for leave to intervene in the case as a plaintiff representing the black voters of Alabama. In the complaint attached to his motion, Bradford alleged that the at-large system for electing the state's appellate judges dilutes the votes of black electors and, pursuant to *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), he sought an injunction requiring that the judges instead be elected from single-member districts. Six days later, Judge Mark Montiel, a member of the Court of Criminal Appeals,[10] sought to intervene as a defendant representing a class of all Republican voters, and a subclass of white Republicans.[11] Montiel alleged that the at-large system dilutes the votes of Republican electors in

---

[9]Jimmy Evans was the Attorney General of Alabama throughout the proceedings in the district court. He was defeated in the November 1994 general election by the current Attorney General, Jeff Sessions. In this opinion, the term "Attorney General" denotes the Attorney General of Alabama.

[10]Judge Montiel did not seek reelection to the Court of Criminal Appeals in the November 1994 general election; accordingly, his term of office on that court expired effective in January 1995.

[11]Also named with Montiel as class representatives were Johnny Curry, a Republican member of the Alabama House of Representatives, and Jack Williams, executive director of the Alabama Republican Caucus. We refer to these class representatives collectively as "Montiel."

violation of the Equal Protection Clause; like Bradford, he sought the creation of single-member districts.[12]

On February 15, 1994, with these motions pending and without the benefit of the State's response to the complaint, the district court held a status conference. The conference was held off the record, and the docket sheet does not indicate who attended the conference or what transpired. What the record does reveal is that the next day the district court entered an order inviting the United States Department of Justice to participate in the proceedings as *amicus curiae.*

On February 22, the State and the Secretary of State answered White's complaint. The answer denied that the legislative acts dividing the Court of Appeals and increasing the size of the three appellate courts had not been precleared under section 5. [13] The answer also denied that the at-large election scheme violates section 2 and that the scheme denies Alabama's black voters the equal protection of the laws.

Two days later, the Attorney General and White, proceeding pursuant to Federal Rule of Civil Procedure 68, filed an "offer and notice of acceptance of judgment" which stated that the case had

---

[12]On March 4, 1994, the district court denied Montiel's motion to intervene as a defendant. On May 17, 1994, as indicated part I.D., *infra,* the court granted Montiel leave to intervene as a class plaintiff on behalf of Republican voters.

[13]With respect to Act No. 93-346, which increased the size of the Court of Civil Appeals, the Attorney General asserted in the State's answer that the statute had been submitted to the Department of Justice for preclearance but that the Department had not responded to the submission.

settled.[14]   In this pleading, they asked the court to give "preliminary approval ... to the [proposed] judgment, and ... to set a time, date, and method of notice to class members for the purpose of facilitating a Rule 23(e) fairness hearing."  Finally, they requested that, "[f]ollowing the Rule 23 fairness hearing[,] ... the court give final approval to the judgment, and request[ed] the Clerk to forthwith enter said judgment in accordance with Rule 68...."[15]

C.

The agreement that White and the Attorney General submitted under Rule 68 would, if implemented, permit the State to retain its at-large system of electing appellate judges.  To remedy the racial vote dilution that this system presumably causes, however, the agreement would provide a mechanism to ensure that those courts would have black membership approximately proportionate to the percentage of blacks in the Alabama voting population.   The agreement, therefore, would create both a quota system and proportional representation.[16]

---

[14]The Rule 68 pleading stated that, in agreeing to the settlement, the State was not admitting liability under the Voting Rights Act or the Constitution.  In fact, throughout this litigation, the State has stood firm in its denial of liability under §§ 2 and 5 of the Voting Rights Act and the Equal Protection Clause of the Fourteenth Amendment.  *See infra* note 15.

[15]In the event the district court did not approve the proposed judgment, the State reserved the right to stand on its answer to White's complaint and to contest the plaintiff's claims under §§ 2 and 5 of the Voting Rights Act and the Equal Protection Clause.

[16]To ensure the perpetuation of the quota system and proportional representation, the proposed settlement agreement provided:

For this mechanism to function at the courts of appeals level, the State (presumably the legislature) would first create two additional judgeships on each of those courts. A "judicial nominating commission" would then propose a slate of three candidates for each of these judgeships; all of the candidates would be black—from plaintiff White's class. The Governor would fill the position by appointment from the slate; if the Governor "fail[ed] or refus[ed], within the allotted time," to do so, the Chief Justice of the Alabama Supreme Court would make the appointment.[17] First Proposed Judgment ¶ 4(a)(iv). The appointee would then serve a full six-year term following which he or she would stand for election. Thereafter, if at any time there were fewer than two black judges on either court, any vacancy on the court would be filled through the foregoing nomination and

> [I]f, after January of 2003, a situation exists on the Supreme Court of Alabama, the Alabama Court of Criminal Appeals or the Alabama Court of Civil Appeals whereby the number of class members who are Associate Justices or Judges on any such Court is fewer than two for more than one year, for any reason, the plaintiffs and the State of Alabama shall attempt to agree on an appropriate measure designed to remedy this situation before the next general election cycle. If the parties are unable to agree on a remedial measure, then the plaintiffs reserve the right to petition the Court for appropriate relief.

First Proposed Judgment ¶ 6. Nothing in this proposed agreement or in the record of the proceedings in the district court indicates what such "appropriate relief" might entail.

[17]The first proposed judgment, as well as the modified agreement White and the Attorney General presented to the district court on April 15, 1994, called for the nominating commission to send its slate of candidates to both the Governor and the Chief Justice. The period of time allotted for making the appointment would vary depending on the circumstances.

appointment process, and the appointee would stand for election after one year.

The nominating commission would be composed of five members. Two members would be chosen "by and from" the White class (by its attorneys), one by and from the Alabama State Bar (an organization consisting of all lawyers licensed to practice in Alabama), one by and from the Alabama Lawyers Association (a traditionally black organization), and one by the other four acting together. In the event of a deadlock, the fifth position would be filled by and from the Alabama Black Legislative Caucus. Thus, presumably three, and possibly all five, of the commissioners would be black.

The same nomination and appointment process would ensure the presence of at least two black justices on the Supreme Court.[18] If by 1995 there were fewer than two black justices on the court, any vacancy on the court would be filled through the process described above until two of the court's members were black. The appointee would stand for election in Alabama's next general election. In 1996, if there were still fewer than two black justices, the State would determine whether every incumbent justice whose seat was up for reelection in 1996 qualified for election under Alabama law. If a justice did not so qualify, his or her seat would become a "remedial" seat and would be filled through the nominating process, with the appointee serving a full six-year term. In 1998 and 2000, if fewer than two justices were black, the legislature would create

_____

[18]As in the case of appointments to the courts of appeals, if the Governor "fail[ed] or refus[ed]" to appoint an associate justice from the nominating commission's slate within the allotted time, the Chief Justice of the Alabama Supreme Court would make the appointment.

an additional seat on the Supreme Court; the seat would then be filled by gubernatorial appointment from a slate of three black candidates presented by the nominating commission. The appointee would serve a full six-year term and then stand for election.[19]

Because this appointment mechanism could lead to a Supreme Court of eleven justices and the parties desired a court of nine, the agreement provided "that if the number of associate justices is increased [beyond nine], a seat on the supreme court would be abolished if it was vacated by a white justice." *White,* 867 F.Supp. at 1561.[20] The parties' proposal, and thus the district court's jurisdiction over the case, "was of unlimited duration." *Id.* at 1532.

On March 4, 1994, while the settlement proposal was pending before the court for preliminary approval, the court granted Bradford's motion for leave to intervene as a plaintiff. The court did not, however, pass on Bradford's request that he be certified

---

[19]How these provisions regarding the Supreme Court would operate together is illustrated by the following hypothetical. Suppose that by 1995 the Supreme Court had no black justices. If one justice retired, his or her seat would be filled through the appointment process described in the text; the appointee would then run in the 1996 general election. If, following that election, the court had fewer than two black justices, the legislature would create a seat, to which a black would be appointed. That appointee would serve out a six-year term and then stand for election. Finally, if, after the 1998 election, the court had fewer than two black justices, the legislature would create a second new seat (for a total of eleven) to which a black would be appointed for a six-year term.

[20]The record contains no indication as to when the Alabama Supreme Court might return to a court of nine justices, nor does the record indicate whether a seat vacated by a white justice would be abolished if the court had fewer than two black justices. At the very least, the proposed agreement is ambiguous on this point.

to represent a class of black voters. In fact, the court never acted on that request. Also on March 4, Christopher Boehm, a white voter, moved for leave to intervene as a "defendant supporting the current system of at-large elections." *Id.* at 1530. Boehm sought certification of a class of Alabama electors who are not black. The court granted Boehm's motion on May 24.

D.

On April 5, the district court held a third off-the-record status conference.[21] Again, the docket sheet does not indicate who attended the meeting or what transpired. Apparently as a result of this conference, White and the Attorney General modified their earlier settlement proposal and, on April 15, submitted the modification to the court in a second Rule 68 filing. The modification purportedly eliminated the quota system originally proposed. Specifically, the new agreement eliminated the requirement that the slates presented by the nominating commission to the Governor contain only blacks. The commission's composition, however, would remain predominantly black.

In addition, the new agreement retained the proportional representation feature of the original proposal.[22] That is, the

---

[21]The court's second off-the-record status conference was held on March 3; it does not appear to be relevant for our purposes.

[22]To ensure the maintenance of proportional representation on Alabama's appellate courts, the modified agreement provided that:

> [I]f, after January of 2003, a situation exists on the Supreme Court of Alabama, the Alabama Court of Criminal Appeals or the Alabama Court of Civil Appeals whereby there are fewer than 2 sitting Associate Justices or judges on any such court who either are members of the

parties intended that two seats on the Supreme Court and the courts of appeals would be occupied by representatives of Alabama's black voters.

Under the new arrangement, the district court would retain jurisdiction for twenty-four years.[23] However, "if the court [found] that any part of the judgment ha[d] not been met it [could], in its discretion, extend any portion of the judgment it deem[ed] appropriate." *Id.* at 1571; Final Judgment ¶ 11.[24]

Prior to this second Rule 68 submission, the United States Department of Justice, exercising its authority under section 5 of the Voting Rights Act, precleared the challenged legislative enactments and the changes the modified settlement agreement would make to Alabama's appellate court structure, contingent on the district court's approval and implementation of that agreement. Armed with this conditional approval, White and the Attorney General, on April 15, 1994, jointly moved the three-judge court presiding over the section 5 claims to stay further proceedings

> plaintiff class or who were appointed pursuant to the judicial nominating commission procedure created by this judgment for more than one year, for any reason, the plaintiffs and the State of Alabama shall attempt to agree on an appropriate measure designed to remedy this situation before the next general election cycle. If the parties are unable to agree on a remedial measure, then the plaintiffs reserve the right to petition the Court for appropriate relief.

Final Judgment ¶ 7; *White,* 867 F.Supp. at 1570.

[23]As noted in part I.C., *supra,* under the original proposal the district court would have retained jurisdiction for an "unlimited duration."

[24]Nothing in the modified proposal or in the record indicates the extent of the district court's discretion to "extend any portion of the judgment it deem[ed] appropriate."

with respect to those claims so that the district court could review their settlement proposal. The three-judge court granted their motion that day.[25]

On May 3, 1994, the district court held its fourth status conference. Again, the conference was held off the record, and the docket sheet does not indicate who attended it or what transpired. On May 17, the court conditionally approved the modified settlement agreement, and scheduled a fairness hearing for July 29, 1994. Also on May 17, the district court, having previously denied Judge Montiel leave to intervene as a party defendant representing Republican voters, *see supra* note 12, granted Montiel leave to intervene as a plaintiff and to file a complaint on behalf of those voters. In his complaint, Montiel claimed that the at-large scheme of electing Alabama's appellate judges denied Republican voters the equal protection of the laws; as a remedy, he sought replacement of the at-large scheme with single-member districts.

Montiel also objected to the modified settlement agreement. First, he claimed that the Voting Rights Act foreclosed as a remedy for vote dilution the nominating commission appointment process White and the Attorney General were advocating. Alternatively, he contended that the proposed appointment process would create an unconstitutional racial quota system for the selection of Alabama's appellate judges. Finally, he asserted that the Attorney General had agreed to this arrangement for the express purpose of

---

[25]The three-judge panel held that it did "not have the jurisdiction to consider the validity of the settlement agreement," because the settlement was essentially a § 2 remedy. *White v. State of Alabama,* 851 F.Supp. 427, 428-429 (M.D.Ala.1994).

perpetuating in office—on the Supreme Court and the courts of appeals—members of the Democratic party and effectively disenfranchising Alabama's Republican voters. [26] If the court rejected the proposed settlement and ordered instead that Alabama's appellate judges be elected from single-member districts—the traditional vote dilution remedy—Republican voters would have a meaningful opportunity to elect members of their party to office.

E.

On July 29, 1994, the "fairness hearing" was held as scheduled.[27] At the hearing, the court entertained objections from intervenors Bradford and Montiel, and from three non-party

---

[26]In addition, Montiel alleged that by eschewing the establishment of single-member districts and preserving the at-large system of elections, the proposed settlement would protect the incumbencies of the current members of those courts by ensuring that none of those members would be opposed for reelection by another member of the court.

[27]In compliance with Fed.R.Civ.P. 23(e), which governs the settlement of class actions, White and the Attorney General provided notice of the proposed settlement in several Alabama newspapers. Notice is provided in class action settlements to give members of the class the opportunity to object to the proposed settlement; here, the notice went "to *all* resident citizens and electors of the State of Alabama." Although the notice went to all of Alabama's citizens, in determining whether the settlement was objectionable the district court considered only whether the black community opposed it. Noting that only two members of that community objected to the proposed settlement, the court inferred that the settlement was unobjectionable. *White,* 867 F.Supp. at 1534.

   After studying the notice, however, we conclude that
   the district court erred in drawing such inference. To be
   effective, class notice must be understandable. The notice
   provided by White and the Attorney General was printed in
   very small type and couched in "legalese" at times so dense
   that even a lawyer would have had difficulty determining the
   settlement's probable impact on Alabama's judicial system
   and on the rights of Alabama voters. It is not surprising
   that few people objected.

objectors,[28] that a final judgment incorporating the settlement would be unlawful on several grounds.  The objectors asserted that the judgment would (1) provide a remedy not authorized by the Voting Rights Act;  (2) violate the Equal Protection Clause by setting aside race-based seats on Alabama's appellate courts;  (3) violate the Alabama Constitution by providing for the appointment, rather than election, of judicial officers for six-year terms;  and (4) disenfranchise all Alabama voters by effectively removing some judicial elections from the ballot box.

These objectors also contended that the Attorney General, a member of the executive branch of the state government, lacked the authority to compel the legislative branch of that government to increase the size of Alabama's appellate courts as the proposed settlement would require.  Under Alabama's constitution, *see supra* note 1, and its separation of powers doctrine,[29] the determination of the size of the state's appellate courts is the legislature's prerogative.  The objectors also contended that the Attorney

---

[28]Among the non-party objectors were Jeff Sessions, the present Attorney General of Alabama, and Perry Hooper, who became Chief Justice of Alabama as the result of the November 1994 general election.

[29]The separation of powers doctrine is expressed in the Alabama Constitution:

> In the government of this state, except in the instances in this Constitution hereinafter expressly directed or permitted, the legislative department shall never exercise the executive and judicial powers, or either of them;  the executive shall never exercise the legislative and judicial powers, or either of them;  the judicial shall never exercise the legislative and executive powers, or either of them;  to the end that it may be a government of laws and not of men.

Ala. Const. art. III, § 43.

General lacked the authority to remove the selection of an appellate judge from the ballot box. That authority resides in the people of Alabama; it is exercised through constitutional amendment. Thus, according to the objectors, the Attorney General, in purporting to bind the legislature and the people of Alabama to the changes the settlement would effect, plainly exceeded his authority.

At the end of the hearing, the district court took the foregoing objections under advisement. Also taken under advisement was a written objection filed by intervening defendant Boehm.[30] Boehm's concern was that, although the modified proposal had eliminated the requirement that only blacks be appointed through the nominating process, the composition of the commission was such that only blacks would be appointed.[31]

On August 31, 1994, the court decided to entertain the plaintiffs' evidence of racial vote dilution and scheduled a hearing thereon for September 2. At that hearing, the court heard the testimony of two expert witnesses who had been employed by White to study voting patterns in prior statewide elections in Alabama. These experts concluded that the voting patterns demonstrated that the state's white voters and black voters tended to vote in racial blocs; thus, white voters were usually able to

---

[30]The court also entertained several other written objections, none of which are pertinent here.

[31]Boehm's memorandum expressed this point as follows: "[T]he record ... clearly establish[es] that the purpose of the Judicial Nominating Commission is to secure the approval of African-American candidates on behalf of African-American voters." Record vol. 6, no. 128, at 5.

preclude black voters from electing their candidates of choice. The experts stated that this situation could be remedied by having the nine justices of the Supreme Court and the five judges of the respective courts of appeals elected from single-member districts. According to one of the experts, Jerry Wilson, the districts could be drawn so that black voters would comprise a majority in two Supreme Court districts and in one district for each court of appeals. At the conclusion of the hearing, the court took the case under submission.

On September 14, the district court held yet another off-the-record status conference. The docket sheet does not reveal who attended the conference or what transpired there. The next day, White and the Attorney General filed a "Joint Notice of Filing of Revised Final Judgment." This document revised the modified proposal considered at the fairness hearing in two substantive respects.

First, the revision made it possible for the nominating commission to have more than nominal white membership. Although it retained the requirement that two members of the commission be blacks, selected by White's lawyers, and that a third member be selected by the traditionally black Alabama Lawyers Association, the revision permitted that association to appoint from outside its membership and thus, perhaps, place a non-black person on the commission. Similarly, in the event of a deadlock in choosing the fifth member of the commission, the Alabama Black Legislative

Caucus could also appoint a non-black to the commission.[32]

Second, the revision eliminated the authority of the Chief Justice of the Alabama Supreme Court to make an appointment from the nominating commission's slate if the Governor failed or refused to do so.

White and the Attorney General served their joint notice on all of the other parties in the case: Bradford, Montiel, and Boehm. Although the proposed revisions to the judgment would substantively change the judicial appointment process, the court invited no response from these other parties. The court did hold another status conference on October 4—this time on the record—but neither these revisions nor any other substantive provisions of the proposed final judgment were discussed.[33]

F.

On October 6, 1994, the district court issued its "Memorandum Opinion and Order" and entered the final judgment White and the Attorney General had proposed following the September 14 status conference. *White v. State of Alabama,* 867 F.Supp. 1519 (M.D.Ala.1994). The court rejected the arguments in opposition to

---

[32]The proposed revision appears to have been an attempt to assuage Boehm's concern that White's and the Attorney General's previous proposals, in providing for a commission dominated by blacks, would ensure that only blacks would be presented to the Governor for appointment. *See supra* note 31. Whether the proposed revision would produce a different result is questionable.

[33]Rather, the record reveals that the court and counsel canvassed the seats on the Supreme Court and the courts of appeals in an effort to identify those whose seats had not been precleared under § 5 of the Voting Rights Act. They also discussed how long some of the appointees to these courts had served prior to standing for election.

the settlement agreement presented at the July 29 fairness hearing. Specifically, the court rejected the notion that the remedy provided by the judgment could not be sanctioned under the Voting Rights Act and that the remedy effectively prescribed a quota system that could not be squared with the Equal Protection Clause. Turning to the argument that the Attorney General had exceeded his authority by agreeing to the proposed settlement, the court held that because the Attorney General has broad authority to conduct litigation for the State, he had the authority to enter into the agreement at issue. Additionally, the court observed that, if necessary to remedy a case of vote dilution, the court would itself have the authority to impose the sort of remedy that White and the Attorney General had proposed.

After disposing of these objections, the court addressed the question of whether, in the face of the State's denial of liability, the plaintiffs had made out a prima facie case under the Voting Rights Act. Citing Alabama's history of discrimination against blacks and the opinion of the two election experts, the court found "a strong basis in evidence" for a case of vote dilution under section 2 of the Act sufficient to justify its approval of the proposed settlement agreement. *White,* 867 F.Supp. at 1554, 1554-57. Given this conclusion, the court apparently deemed it unnecessary to reach White's claim under the Equal Protection Clause.

The same day it entered a final judgment incorporating the settlement agreement White and the Attorney General had reached, the court granted the State summary judgment on Montiel's equal

protection claims. *White v. State of Alabama,* 867 F.Supp. 1571 (M.D.Ala.1994). Montiel appeals that ruling in No. 94-7081. We dispose of part of his appeal in the margin.[34] We consider the remaining part of Montiel's appeal in No. 94-7024, which Montiel and Bradford are prosecuting jointly.[35] We resolve their appeal in the discussion that follows.

## II.

The first question we address is whether section 2 of the Voting Rights Act forecloses the remedy provided in the district

---

[34]As noted in part I.D., *supra,* Montiel alleged in his complaint that the at-large system for electing Alabama's appellate judges denies Republican voters the equal protection of the laws. As a remedy, he sought the creation of a single-member district scheme. In addition to asserting this claim, Montiel questioned the legality of the settlement White and the Attorney General had proposed. He claimed that the Voting Rights Act foreclosed the adoption of the settlement as a remedy for vote dilution. Further, he alleged that the proposed appointment process would create an unconstitutional racial quota system for the selection of Alabama's appellate judges. Finally, he contended that the Attorney General and White crafted their settlement for the express purpose of perpetuating in office members of the Democratic Party and effectively disenfranchising Alabama's Republican voters.

In appealing the district court's grant of summary judgment, Montiel did not challenge the district court's rejection of the cause of action he brought on behalf of Republican voters under the Equal Protection Clause. Accordingly, we deem it abandoned and dismiss his appeal in No. 94-7081. We consider Montiel's objections to the remedial portions of the district court's final judgment in No. 94-7024. In that appeal, Montiel and Bradford filed a joint brief; hence, we treat their arguments as having been jointly made.

[35]Although the State of Alabama is an appellee, the present Alabama Attorney General, Jeff Sessions, also challenges as unlawful the district court's final judgment; in effect, he contends that his predecessor in office invited the district court to commit error. For purposes of this appeal, however, we assume that the State is bound by the settlement agreement the former Attorney General, Jimmy Evans, urged upon the district court.

court's judgment. In the context of this case, the question becomes whether the Act precludes the district court from removing judicial selection from the ballot box, and whether the Act precludes proportional representation. We consider these issues in turn.

A.

Section 2 of the Act applies to state judicial elections. *Chisom v. Roemer,* 501 U.S. 380, 404, 111 S.Ct. 2354, 2368, 115 L.Ed.2d 348 (1991). Here we are concerned with whether the relief provided by the district court's judgment is within the scope of section 2. *See United States v. Dallas County Comm'n,* 850 F.2d 1433, 1437-38 (11th Cir.1988), *cert. denied,* 490 U.S. 1030, 109 S.Ct. 1768, 104 L.Ed.2d 203 (1989).

Section 2 provides:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color....

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to *elect* representatives of their choice. The extent to which members of a protected class have been *elected* to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class *elected* in numbers equal to their proportion in the population.

42 U.S.C. § 1973 (emphasis added).

Congress enacted section 2 to give those who had been

disenfranchised on account of their race the opportunity to participate in the political process. The Act is designed to redress past discrimination that inhibited the ability of minorities to express their preference for certain candidates through the electoral process, i.e., at the ballot box.[36] Sections 4 and 5 of the Act prohibit the use of tests or devices, and the alteration of voting qualifications or procedures, in a manner that deprives citizens of their right to vote. *See* 42 U.S.C. §§ 1973b, 1973c. Section 2 proscribes practices that, while permitting a mechanical exercise of the right to vote, dilute the votes of a racial minority (through gerrymandering or other tactics) and thus render its votes meaningless. *See Shaw v. Reno,* --- U.S. ----, ---, 113 S.Ct. 2816, 2823, 125 L.Ed.2d 511 (1993). In essence, the Act empowers minorities by providing them meaningful access to the ballot box.

The nexus between section 2 and the act of voting is further evidenced when one considers the source of authority for section 2. Section 2 was enacted to enforce the Fifteenth Amendment's prohibition against denying a citizen the right to vote "on account of race."[37] U.S. Const. amend XV; *NAACP v. New York,* 413 U.S. 345,

---

[36]The legislative history is clear in this respect: "The court should exercise its traditional equitable powers to fashion the relief so that it completely remedies the prior dilution of minority voting strength and fully provides equal opportunity for minority citizens to participate and *to elect candidates of their choice.*" S.Rep. No. 417, 97th Cong., 2d Sess. 31, *reprinted in* 1982 U.S.C.C.A.N. 177, 208 (emphasis added).

[37]The Fifteenth Amendment reads:

> Section 1. The right of citizens of the United States *to vote* shall not be denied or abridged by the United States or by any State on account of race,

350, 93 S.Ct. 2591, 2595, 37 L.Ed.2d 648 (1973); *Allen v. State Bd. of Elections,* 393 U.S. 544, 556, 89 S.Ct. 817, 826, 22 L.Ed.2d 1 (1969) ("The Act was drafted to make the guarantees of the Fifteenth Amendment finally a reality for all citizens.").[38]

A judicial remedy fashioned under section 2 must therefore enhance the ability of the plaintiffs to *elect* their candidates of choice. Any remedy that has the effect of eliminating this essential element of choice is invalid, for it contravenes the spirit and purpose of the Act. A remedy such as the one fashioned in this case, calling for the appointment of judges to posts which, under state law, are to be filled by election, effectively nullifies voting power and contravenes the stated objectives of

---

color, or previous condition of servitude.

Section 2. The Congress shall have power to enforce this article by appropriate legislation.

U.S. Const. amend. XV (emphasis added). As Justice Frankfurter stated, "[t]he Amendment nullifies sophisticated as well as simple-minded modes of discrimination. It hits onerous procedural requirements which effectively handicap *exercise of the franchise* by the colored race...." *Lane v. Wilson,* 307 U.S. 268, 275, 59 S.Ct. 872, 876, 83 L.Ed. 1281 (1939) (emphasis added). It has been employed to strike down such tactics as the grandfather clause, *see Guinn v. United States,* 238 U.S. 347, 35 S.Ct. 926, 59 L.Ed. 1340 (1915), and racial gerrymandering, *see Gomillion v. Lightfoot,* 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960). Constitutional challenges to those practices are now analyzed under the Equal Protection Clause rather than the Fifteenth Amendment.

[38]The same is true of other provisions in the Voting Rights Act. *See, e.g., City of Rome v. United States,* 446 U.S. 156, 177, 100 S.Ct. 1548, 1562, 64 L.Ed.2d 119 (1980) ("[T]he Act's ban [in § 5] on electoral changes that are discriminatory in effect is an appropriate method of promoting the purposes of the Fifteenth Amendment...."). For a more detailed account of the history and purpose of the Voting Rights Act, see *Shaw v. Reno,* --- U.S. ----, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993).

section 2.

In short, the district court has employed the Voting Rights Act to usurp voting power from the very minority which, under the Act, is entitled to wield it. Such a practice can hardly be condoned. We have repeatedly insisted that the Act guarantees the right to *elect* representatives. *See, e.g., Southern Christian Leadership Conference v. Sessions,* 56 F.3d 1281, 1296 n. 25 (11th Cir.1995) (en banc), *cert. denied,* --- U.S. ----, 116 S.Ct. 704, --- L.Ed.2d ---- (1996). The will of the people is expressed through elections, not by commissions created to divine their preferences for them. We "find[ ] a certain irony in using the Voting Rights Act to *deny* citizens the right to select public officials of their choice."[39] *Brooks v. State Bd. of Elections,* 848 F.Supp. 1548, 1568, *remanded and appeal dismissed as moot,* 59 F.3d 1114 (11th Cir.1995) (emphasis added).

The district court seeks to justify this denial by presuming that the nominating commission will "serve as a proxy for black voters" in choosing the slate presented to the Governor for

---

[39]We note that *all* Alabama voters, both black and white, are disenfranchised by the settlement's appointment process. The district court's order does not address this problem. The court's observation that some of Alabama's judges have been appointed to office in the past is of no moment. *See White,* 867 F.Supp. at 1536. Those appointments have occurred pursuant to state law, not as a remedy for a violation of § 2 of the Voting Rights Act. Under the Alabama Constitution, the governor fills vacancies that occur mid-term. Ala. Const. amend. 328, § 6.14 (1973). Also beside the point is the court's observation that the judges appointed pursuant to the final judgment will eventually have to stand for election, and thus that the disenfranchisement wrought by the court's judgment will merely be temporary. *See White,* 867 F.Supp. at 1536. The fact remains that some of those judges will hold office for six years before the voters of Alabama have a chance to meet them in the ballot box. *See id.* at 1526.

appointment to the appellate bench. *White,* 867 F.Supp. at 1561.

We are not persuaded. How the nominating commission is to be

informed of the views of Alabama's black voters is nowhere

explained. The best the court could say is that the commission is

"composed in a manner to attempt to reflect the interests of most

African-American Alabamians." *Id.* at 1526.

The nominating commission created by the district court's

judgment resembles, but only superficially, the nominating

commissions many states employ under the so-called "Missouri Plan"

as a means of ensuring that judicial appointments are made on merit

as opposed to sheer political expediency. [40] Under a typical

---

[40]Thirty-four states and the District of Columbia currently
have "Missouri Plans" for the selection of some or all of their
judges. *See* Jona Goldschmidt, "Merit Selection: Current Status,
Procedures, and Issues," 49 *U.Miami L.Rev.* 1, 2-3 (1994). In
most states, the plan is implemented by a constitutional or
statutory provision. *Id.* at 19-20.

     Every state in the Eleventh Circuit uses a nominating
commission for some judicial appointments. In Alabama,
several counties have five-member commissions for the
appointment of circuit judges (who, following their
appointment, must run in the next general election). Two of
the commission members are lawyers chosen by the state or
county bar. Two non-lawyer members are selected by the
legislature, and the last member is a judge, chosen by the
judges of the circuit. *See* Ala. Const. amend. 328, § 6.14;
*see also* Ala. Const. amends. 83 and 110 (Jefferson County).
In Georgia, a nine-member commission is charged with filling
interim vacancies on all state courts save the supreme
court. The governor appoints five members of the
commission, three lawyers and two non-lawyers. The
lieutenant governor and the speaker of the house of
representatives each appoint one non-lawyer member, and two
members serve *ex officio. See* Ga. Const. art. VI, § VII,
para. III; Executive Order, Judicial Nominating Commission
(Feb. 27, 1995) (establishing commission for Governor Zell
Miller's term in office). Florida has nine-member
commissions to fill vacancies in all levels of the state
judiciary. Three members are appointed by the governor,
three are appointed by the Florida Bar, and three are
elected by majority vote of other six. *See* Fla. Const. art.

"Missouri Plan," a state's voters have a choice in the composition of the nominating commission because, in large part, those who appoint the commissioners are elected officials, such as the governor or the members of the legislature. Here, by way of contrast, Alabama's voters will have essentially no choice. Two members of the commission will be hand-picked by the plaintiff's lawyers from the class White represents; no commission members will be chosen by elected representatives. The commission will be overseen by a life-tenured federal district judge who retains the power to fashion "appropriate relief" in the event the scheme fails to ensure the presence of at least two representatives of the plaintiff class on each of Alabama's appellate benches. *See supra* note 23. The only actor in the court's plan who is accountable to the voters is the Governor, and his hands will be tied by the court's judgment.[41] Dissatisfied voters, black or white, will have no recourse if the candidates the commission selects are unsatisfactory; thus, the commission will have a license to select its nominees with impunity.

Accordingly, we conclude that an appointment procedure such as the one the district court would implement in this case is a remedy foreclosed by the Voting Rights Act.[42] The United States Department

---

5, § 11; Fla.Stat. § 43.29.

[41]There is no provision in the judgment that would give the Governor the authority to reject a slate proposed by the nominating commission on the ground that the nominees possessed nothing more than the bare legal qualifications for judicial office.

[42]Because we dispose of the district court's judgment on the ground that it violates the Voting Rights Act, we need not, and indeed should not, discuss whether the judgment violates the

of Justice, appearing as *amicus curiae,* conceded this point in oral argument, but contended that because the district court's final judgment is a "consent decree," the fact that the remedy it provides is not authorized by the Voting Rights Act should not concern us. We address this argument, and reject it, in part IV, *infra.*

B.

The goal the White class seeks to achieve in this case is proportional representation on Alabama's appellate courts.[43] Both

Equal Protection Clause by setting aside race-based seats on Alabama's appellate courts. *See Ashwander v. Tennessee Valley Auth.,* 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring) ("The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of.").

[43]Moreover, the White class seeks to achieve this goal without paying the price a minority might be expected to pay to attain proportional representation. That is, the typical remedy for racial vote dilution yielded by at-large voting in a multi-member district is to divide the district into single-member districts if the plaintiff minority is sufficiently cohesive and compact to comprise a majority in one or more single-member districts. *See Gingles,* 478 U.S. at 50, 106 S.Ct. at 2766. In such a case, the minority, having been cabined in this manner, necessarily loses influence in the other districts. *See Nipper v. Smith,* 39 F.3d 1494, 1543 (11th Cir.1994) (en banc), *cert. denied,* --- U.S. ----, 115 S.Ct. 1795, 131 L.Ed.2d 723 (1995); *League of United Latin American Citizens v. Clements,* 999 F.2d 831, 873 (5th Cir.1993) (en banc).

In this case, the trade-off described above does not occur; rather, in choosing the members of the appellate bench, the influence of the minority voters is disproportionately enhanced at the expense of the majority. That is, the minority is given the right to fill by appointment two seats on each of the appellate courts while at the same time maintaining its admittedly "significant influence" in the choice of those selected through the ballot box. *White,* 867 F.Supp. at 1535. According to members of the White class, who urged the court to approve the settlement, "the proposed settlement is superior to single-member districts for appellate courts because

the original and modified settlement proposals presented to the district court make this quite clear. Section 2 of the Voting Rights Act states, however, that "nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." 42 U.S.C. § 1973(b); *see Thornburg v. Gingles,* 478 U.S. 30, 84, 106 S.Ct. 2752, 2784, 92 L.Ed.2d 25 (1986) (O'Connor, J., concurring). Notwithstanding this statutory caveat, the district court used the attainment of proportionality as a justification for entering the judgment at hand. The following paragraph from the court's opinion illustrates this point:

> [T]he court notes that blacks comprise approximately 25% of the population of Alabama and 23% of the voting age population. For the purposes of this inquiry, the court chooses the more conservative figure of 23% for the relevant pool. In affirmative action terms, this means that absent voting discrimination it would be expected that around 23% of judges would be minority-preferred candidates. The proposed settlement contemplates relief reaching two seats on each of the seven-member appeals courts or 28% of the seats and two seats on the nine-member supreme court or 22% of the seats. The court finds that the number of judgeships reached by the proposed settlement as a percentage of the seats on each appellate court is comparable to the black percentage of the voting age population in Alabama.

*White,* 867 F.Supp. at 1562. This statement speaks for itself—in approving the settlement, the district court ignored Congress's admonition that the Voting Rights Act is not be used as a vehicle to establish proportional representation.

---

at-large seats allow blacks to have a significant influence on all appellate judges, rather than have their dominance limited to a small number of districts with little presence in the majority of districts." *Id.* (citing affidavits of Richard Arrington, Jr., mayor of Birmingham, Alabama, and Joe L. Reed, chairman of the Alabama Democratic Conference (a statewide black political organization that is an arm of the Alabama Democratic Party)).

III.

Putting aside the question whether the district court's remedy is cognizable under section 2, we conclude that the district court, in fashioning its remedy, lacked the authority to require Alabama to increase the size of its appellate courts. We base our conclusion that the court lacked such power on *Nipper v. Smith,* where we said that "federal courts may not mandate as a section 2 remedy that a state or political subdivision alter the size of its elected bodies." *Nipper v. Smith,* 39 F.3d 1494, 1532 (11th Cir.1994) (en banc), cert. denied, --- U.S. ----, 115 S.Ct. 1795, 131 L.Ed.2d 723 (1995).[44]

We also draw, as we did in *Nipper,* on the Supreme Court's decision in *Holder v. Hall,* --- U.S. ----, 114 S.Ct. 2581, 129 L.Ed.2d 687 (1994). In *Holder,* black plaintiffs proposed as a remedy for racial vote dilution that the court increase the membership of a county commission from one person to six, a chairman to be elected at large and five members to be elected from single-member districts. According to the plaintiffs, the black voting population was sufficiently cohesive and compact to constitute a majority in one of the suggested single-member districts.

The Supreme Court rejected the plaintiffs' proposal. The Court held that the plaintiffs had no case under section 2 because there was no objectively reasonable "benchmark" with which to compare the existing scheme in order to determine whether racial

---

[44]*Nipper* was decided in December of 1994, and thus the district court did not have the benefit of *Nipper* 's holding when it decided this case.

vote dilution was actually taking place. "In order for an electoral system to dilute a minority group's voting power, there must be an alternative system that would provide greater electoral opportunity to minority voters." *Id.* at ----, 114 S.Ct. at 2589 (O'Connor, J., concurring). When comparing the sizes of elected bodies, there are many possible alternatives, but no "principled reason why one size should be picked over another as *the* benchmark for comparison." *Id.* at ----, 114 S.Ct. at 2586 (plurality opinion) (emphasis added). It is not the absence of a benchmark that is the problem when evaluating the size of an elected body; the difficulty is that a court cannot reasonably choose one benchmark over another.[45]

This difficulty is presented also by this case. The district court constructed a benchmark by using proportional representation. As noted part II.B., *supra,* the court observed that blacks comprise 23% of the voting age population in Alabama; accordingly, 23% of the judges should be minority-preferred candidates. *White,* 867 F.Supp. at 1562. Having drawn this conclusion, the court asked, in effect: How large must the Supreme Court and the courts of appeals be to ensure that minority-preferred candidates occupy that percentage of the courts' seats? The answer is a Supreme Court with nine, ten, or eleven seats and courts of appeals with seven

---

[45]The question before the Court in *Holder* was one of statutory interpretation: whether increasing the size of the Bleckley County Commission was permissible under § 2. The Court did not find the answer to this question in the language of the statute or its legislative history; it found the answer by considering the difficulty a district court would encounter in inferring a reliable benchmark from the circumstantial evidence before it.

seats each.

The problem with these benchmarks is that they are not principled. Rather, they are based on proportional representation, which, under the Voting Rights Act, is impermissible. *See supra* part II.B. Once these benchmarks are eliminated, one must engage in sheer speculation to arrive at an appropriate benchmark, or size, for each court. With respect to the courts of appeals, for example, one might argue that six judges would suffice; another might opt for seven or eight.[46] *Holder* precludes this sort of speculation.

## IV.

As our discussion in Parts II and III makes clear, the remedy the district court prescribed in this case is foreclosed by the Voting Rights Act and by precedent. The Department of Justice concedes this point,[47] but contends, as does White, that the district court's final judgment is a "consent decree," and that, as such, the judgment could provide relief beyond that authorized by the Act. We are not persuaded.

## A.

First, the district court's final judgment is not a consent decree. It is a final judgment, because it disposes of all of the

---

[46]As noted in part I.E., *supra,* the plaintiffs' own experts testified at the August 31, 1994, hearing that the vote dilution they found in the at-large scheme could be remedied by having Alabama's appellate judges elected from single-member districts, without increasing the size of the courts. Hence, it was unnecessary for the court to increase the size of the appellate courts in order to grant the plaintiffs relief.

[47]The White class does not join in the Department's concession.

claims and defenses of all of the parties in the case.   *See* 28

U.S.C. § 1291;   *Andrews v. United States,* 373 U.S. 334, 83 S.Ct.

1236, 10 L.Ed.2d 383 (1963).  But it is not a final consent decree,

because not all of the parties consented to its entry.  White, the

Attorney General, the Department of Justice, and the district court

refer to the final judgment as a "consent decree."[48]  That, however,

does not make it one.

Here, the court entered a *final* judgment that rejected the

relief sought by some parties, Bradford and Montiel,[49] and

---

[48]The district court, in its memorandum opinion, appears to
treat its final judgment as a consent decree.  Nowhere in its
opinion, however, does the court explain how a consent decree can
be entered without the consent of all parties.

[49]As noted in part I.C., *supra,* Bradford became a party on
March 4, 1994, when the district court granted him leave to
intervene as a plaintiff and to file a complaint.  In that
complaint, Bradford alleged that he represented a class
consisting of all of Alabama's black voters, and asked the court
to recognize him as the representative of such class.  For
relief, Bradford sought the election of Alabama's appellate
judges from single-member districts.  In contrast, White, in the
settlement proposal he and the Attorney General had submitted to
the court, sought the remedy the district court eventually
imposed.  Thus, the district court was faced with one plaintiff,
Bradford, seeking one form of relief, and another plaintiff,
White, seeking a dramatically different, and totally
inconsistent, remedy.  The court could have solved the dilemma by
dividing the plaintiff class of black voters into two subclasses:
one represented by White, the other by Bradford.  The court,
however, did nothing.  Consequently, we are left with two
plaintiffs seeking mutually exclusive forms of relief.

Bradford, because he is a black voter, is by definition
a member of the White class.  No one has contended, however,
that Bradford is thereby foreclosed from objecting to the
relief White seeks or from pursuing an alternative remedy
for the alleged vote dilution.  Rather, White and the
Attorney General, apparently deferring to the district
court's decision to grant Bradford plaintiff status by
permitting him to intervene and to file a complaint, have
treated Bradford as an independent party in this litigation.

Montiel became a party on May 17, 1994, and was

incorporated the relief proposed jointly by other parties, White and the State.  In this circuit, a decree that provides a remedy agreed to by some, but not all, of the parties cannot affect the rights of a dissenting party.  *United States v. City of Miami,* 664 F.2d 435, 442 (5th Cir.1981) (en banc) (opinion of Rubin, J.).  [50] Here, Bradford and Montiel are non-consenting dissenting parties.[51] Indeed, they vigorously objected to the remedy White and the

certified to represent a plaintiff class of Republican voters.  In addition to challenging the at-large election scheme, Montiel alleged that the White-Attorney General proposal, if implemented, would disenfranchise Alabama's republican voters.  Like Bradford, Montiel sought the creation of single-member districts.

[50]*City of Miami,* though decided after the split of the former Fifth Circuit, is part of the law of this circuit.  *See, e.g., Barfus v. City of Miami,* 936 F.2d 1182, 1184 (11th Cir.1991).

[51]Nor did Boehm, who had intervened in the case as a defendant representing a class of non-black voters, consent to the entry of the judgment.  Boehm contended that the current at-large system for electing appellate judges was lawful and therefore should be maintained.  Thus, his position was at odds with that taken by White and the Attorney General.

After White and the Attorney General made their Rule 68 filing on April 15, 1994, and in advance of the July 29 fairness hearing, Boehm objected to their settlement proposal on the ground that the composition of the nominating commission ensured that only blacks would be appointed through the nominating process.  According to Boehm, excluding "members of the "Boehm Class' [non-black voters] from the Judicial Nominating Commission not only violates the rights of the "Boehm Class' by not allowing them to participate in the selection of potential candidates for these appellate judges positions, but also prevents the "Boehm Class' from being able to adequately monitor the ... Commission for any discriminatory action they may take...." Record vol. 6, no. 128, at 5-6.

Boehm has not appealed the district court's final judgment.  During the oral argument of this case on appeal, his attorney announced that Boehm had no objection to the implementation of the judgment.

Attorney General proposed because, among other things, it would deprive them of their right to vote for judicial officers.

B.

Assuming, for sake of argument, that the district court's judgment is a consent decree, we address the question whether, for that reason, the court had the authority to provide a remedy not authorized by the Voting Rights Act. White and the Department of Justice cite only one case in support of the proposition that a district court, in entering a consent decree, may provide relief beyond that authorized by Congress. *See Local No. 93, International Ass'n of Firefighters v. City of Cleveland,* 478 U.S. 501, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986). That case, however, is inapposite.

In *Local No. 93,* the plaintiffs, an association of black and Hispanic firefighters employed by Cleveland's fire department, alleged that, in violation of Title VII of the Civil Rights Act of 1964, various city officials had discriminated against its members on the basis of race and national origin in hiring, assigning, and promoting firefighters. The city and the association entered into a settlement which, if approved by the court, would provide, among other things, prospective relief to unknown persons who had not suffered the alleged discrimination. The firefighters' union intervened in the case for the purpose of objecting to the settlement. It contended that Title VII barred the court from granting relief that benefitted individuals who were not actual victims of the discriminatory practices. *See* Civil Rights Act of 1964, Pub.L. No. 88-352, § 706(g)(2)(a), 78 Stat. 241, 261, 42

U.S.C. § 2000e-5(g)(2)(a) (1988 & Supp. V 1993).

The district court incorporated the settlement into a consent decree, and the union appealed. The Sixth Circuit affirmed, *Vanguards of Cleveland v. City of Cleveland,* 753 F.2d 479 (6th Cir.1985), and the Supreme Court granted certiorari, 474 U.S. 816, 106 S.Ct. 59, 88 L.Ed.2d 48 (1985), to answer the question: "whether § 706(g) of Title VII ... precludes the entry of a consent decree which provides relief that may benefit individuals who were not the actual victims of the defendant's discriminatory practices." *Local No. 93,* 478 U.S. at 504, 106 S.Ct. at 3066.

Drawing on the language of section 706(g) and Title VII's legislative history, the Court concluded that the provision did not apply to the relief the district court granted. *Id.* at 515, 106 S.Ct. at 3071. Moreover, the relief appeared to be in keeping with Title VII's remedial objectives and thus within statutory bounds. At the same time, the Court recognized that "the parties may [not] agree to take action that conflicts with or violates the statute upon which the complaint [is] based." *Id.* at 526, 106 S.Ct. at 3077.[52] In the context of the case before it, the implementation of the agreement might deprive firefighters not before the court of their right not to be subjected to reverse racial discrimination in violation of Title VII or the Fourteenth Amendment. In the event of such violation, the fact that the decree had been affirmed would

---

[52]In cases where the Supreme Court has found that a consent decree violates the statute under which the relief is granted, the Court has not hesitated to set aside the decree. *See Firefighters Local Union No. 1784 v. Stotts,* 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984); *System Fed'n No. 91, Railway Employes' Dep't v. Wright,* 364 U.S. 642, 81 S.Ct. 368, 5 L.Ed.2d 349 (1961).

not render it "immune from attack."  *Id.*

In the case at hand, unlike in *Local No. 93,* the injury is immediate.  The district court's decree, if implemented, will directly injure parties now before the court by depriving them of their right to vote.  Hence, there is no cause for this court to defer consideration of the question, which we reach in part II, *supra,* whether the decree's remedy is foreclosed by the Voting Rights Act.[53]

V.

We dismiss the appeal in No. 94-7081.  *See supra* note 34.  In No. 94-7024, we vacate the district court's judgment and remand the case to the three-judge court for further proceedings.  We remand the case to the three-judge court, rather than the single-judge district court, because this case is pending before the three-judge

_____

[53]The Court's opinion in *Local No. 93* also informs our discussion in part IV.A, *supra.*  One of the union's arguments was that the consent decree was invalid because it was entered without the union's consent.  The Court rejected that argument because the union had presented no claim for relief to the district court;  that is, it had no cause of action in its own right and it could not prosecute reverse discrimination claims (of its members) that had not yet arisen.  The union's sole reason for intervening in the case, therefore, was to protest the settlement.

The Court indicated that, had the settlement affected the union's rights, the decree could not have been entered without its consent.  As the Court observed:

[P]arties who choose to resolve litigation through settlement may not dispose of the claims of a third party ... without that party's agreement.  A court's approval of a consent decree between some of the parties therefore cannot dispose of the valid claims of nonconsenting intervenors;  if properly raised, these claims remain and may be litigated by the intervenor.

*Local No. 93,* 478 U.S. at 529, 106 S.Ct. at 3079 (citations omitted).

court.  As indicated in part I.D. and note 25, *supra,* that court stayed further proceedings in the case solely to permit the district court, proceeding under section 2 of the Voting Rights Act, to entertain White's and the Attorney General's settlement agreement.  Now that their agreement has been set aside and the state's answer, which denies liability under both section 2 and section 5 of the Act (as well as the Equal Protection Clause), stands reinstated in full, see part I.B. and notes 14 and 15, *supra.*  The case is in the posture it occupied when the three-judge court stayed its hand.  Hence, given the state's denial of liability, the first claim to be addressed—the claim before the three-judge court—is White's section 5 claim:  whether the legislative enactments cited in part I.A., *supra,* which increased the Supreme Court from seven to nine justices, divided the Court of Appeals into the courts of criminal and civil appeals, and then increased their respective sizes from three to five judges—are invalid for want of section 5 preclearance by the United States Department of Justice.[54]

---

[54]Our disposition of the appeal in No. 94-7024 renders unnecessary our consideration of the question whether the remedy the district court fashioned, if implemented, would create a racial quota system for the selection of Alabama's appellate judges.  It is also unnecessary for us to consider whether, consistent with Alabama's separation of powers doctrine and the state's constitution, the Attorney General had the authority under Alabama law to bind the legislature, the Governor, and the people of Alabama (in whom the power to amend the state's constitution resides) to the agreement he reached with White.  *See supra* notes 1, 2, 6 and 29.  Nor is it necessary for us to decide the related question whether, in the interest of comity, the district court, using Fed.R.Civ.P. 19 and 23, should have made the branches of the Alabama legislature and the Governor parties-defendant in this highly sensitive case.  *See* 7A Wright, Miller & Kane, Federal Practice and Procedure § 1770.

SO ORDERED.

BLACK, Circuit Judge, specially concurring:

I concur in the conclusion, stated in section IV.A of the majority opinion, that there was no valid consent decree upon which the district court could have entered its judgment. I therefore concur in the result as well. Since the district court's judgment must be vacated because it was premised on an invalid consent decree, our analysis should end at this point.

The three-judge court granted Bradford and Montiel's motions to intervene in this suit as party plaintiffs, and the parties have not appealed these rulings. Once a party intervenes, he becomes a full participant and is entitled to have his claims litigated. *Alvarado v. J.C. Penney Co.,* 997 F.2d 803, 805 (10th Cir.1993); 7C Charles A. Wright, Arthur R. Miller & Mary K. Kane, Federal Practice and Procedure § 1920 (1986). The original parties to a suit may not, through a purported consent decree settling the claims between them, stipulate away the rights of an intervening party without his approval. *Local Number 93, Int'l Ass'n of Firefighters v. City of Cleveland,* 478 U.S. 501, 529, 106 S.Ct. 3063, 3079, 92 L.Ed.2d 405 (1986) (citing *Wheeler v. American Home Products Corp.,* 563 F.2d 1233, 1237-38 (5th Cir.1977)); 3B James W. Moore, Moore's Federal Practice ¶ 24.16[6] (2d ed. 1995). It follows that a consent decree that compromises a non-consenting party's claims is invalid to the extent that it does so. *See Local Number 93,* 478 U.S. at 529, 106 S.Ct. at 3079; *United States v. City of Miami, Fla.,* 664 F.2d 435, 442 (5th Cir.1981) (en banc) (Rubin, J.); *League of United Latin American Citizens v. Clements,*

999 F.2d 831, 846 (5th Cir.1993) (en banc), *cert. denied,* --- U.S. ----, 114 S.Ct. 878, 127 L.Ed.2d 74 (1994).

In the case before us, the settlement reached by the White class and the State of Alabama resolved the claims of Bradford and Montiel contrary to their interests and without their consent. Bradford and Montiel, however, were entitled as party plaintiffs to fully litigate their claims. They did not receive this opportunity. The district court believed, erroneously, it had before it a valid consent decree; and the court entered its final judgment based on the purported consent decree. Since the consent decree was invalid[1], the court could not enter a final consent judgment and we need not consider the substance of the invalid judgment.

---

[1]The decree would also be invalid if, as maintained by the appellants, the state's attorney general did not have authority to negotiate the decree and bind the Alabama legislature, governor and populace to a plan that would alter state constitutional and statutory provisions.